# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *People v. Cline*, 2020 IL App (1st) 172631

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN CLINE, Defendant-Appellant. |
| | |
| District & No. | First District, First Division<br>No. 1-17-2631 |
| | |
| Filed<br>Supplemental<br>opinion upon<br>denial of rehearing | March 2, 2020<br><br><br>July 13, 2020 |
| | |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CR-18158; the Hon. Vincent M. Gaughan, Judge, presiding. |
| | |
| Judgment | Reversed. |
| | |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Jennifer L. Bontrager, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and David H. Iskowich, Assistant State's Attorneys, of counsel, and Anne Bayly Buck, law student), for the People. |

| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Griffin and Justice Walker concurred in the judgment and opinion. |

Justice Walker also specially concurred, with opinion.

**OPINION**

¶ 1     John Cline's conviction for residential burglary hangs on the thread of testimony by a fingerprint expert about an incomplete analysis of a partial print. That print was found on a portable object at the scene. The State makes much of the respect we must pay to the trial court's factual and credibility findings, which we acknowledge we must. But this case is about the sufficiency of credible evidence, not the credibility of sufficient evidence, and the fingerprint expert's testimony lacks the specificity required to support Cline's conviction.

¶ 2                                         Background

¶ 3     Tom Slowinski testified that the front and the back doors were locked when he left his apartment around 8:15 a.m. on September 1, 2015. When he returned that evening, he saw the front door was ajar and had scratches. Inside, the apartment appeared "ransacked and torn apart." He noticed items missing, including his laptop and headphones, so he called the police. At trial, Slowinski identified a photograph of a "Shore Headphone" case. When he left the apartment that morning, the headphones were in the case. When he returned, the case had been moved, and the headphones were gone. He did not know Cline and had not given Cline permission to be inside his apartment. During cross-examination, Slowinski testified that he had been out of town the week before the incident and had given a house key to a friend. He did not know whether the friend knew Cline.

¶ 4     Testimony revealed that a Chicago Police Department evidence technician processed the headphone case and identified a "fingerprint ridge impression," which he "lifted" with clear plastic contact paper. At a police station, a department aide fingerprinted Cline, and after apprising Cline of the *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), a detective asked Cline if he would have reason to be at Slowinski's address or inside an apartment there. Cline said "he would not be over in that area."

¶ 5     Daniel Dennewitz testified that for about eight years he had worked in the Chicago Police Department latent prints unit, analyzing and comparing latent fingerprints, and had done fingerprint analysis for "[j]ust over a year or so." Dennewitz received training in fingerprint identification and examination and had been qualified as an expert in the area of fingerprint examination and identification on five occasions. After Cline's counsel declined to question Dennewitz about his qualifications, the trial court found Dennewitz qualified to testify as an expert in the area of fingerprint identification.

¶ 6     Dennewitz explained that identifications involve a side-by-side comparison of the unknown fingerprint to a "known print" at three different levels of detail. The first level of detail includes "the actual ridge pads, the flow of the ridges, [and] the pattern." But, with level one, a fingerprint only can be excluded rather than identified. Level two spots the uniqueness in the "detail within the ridge pads" themselves, such as "a ridge end, a bifurcation of the

friction ridge pads, and a dot." The analyst looks at the positioning of these details, or their "pattern," and if they coincide then the two prints came from the same source.

¶ 7 Dennewitz identified State's exhibit number 5, the fingerprint lift. There were four latent prints on the lift. Dennewitz determined "A2" was suitable for comparison. He chose this print because it had a "sufficient amount of detail" from which he could form an opinion. Dennewitz compared A2 to a known print of Cline's right middle finger and concluded that they came from the same source. Dennewitz identified the State's exhibit number 7, which was a "demonstration" of the comparison. Of the about 20 points of comparison, 9 points were diagramed on the exhibit. He then did a second comparison of Cline's right middle finger, "using the same identification procedure," and concluded, within a reasonable degree of scientific certainty based on his experience, training, and education, that the two prints came from the same source.

¶ 8 During cross-examination, Dennewitz acknowledged that the latent print only showed one side of the finger—"the core[,] which is the middle of the print." Dennewitz explained that he marked nine points on the recovered print, three points from the left, three from the bottom, and three from the right of the "core." Because the latent fingerprint was incomplete, Dennewitz had to assume that what was not captured in the partial print would be the same as those areas in Cline's known print.

¶ 9 Cline did not present evidence.

¶ 10 In finding Cline guilty of residential burglary, the trial court said that Slowinski did not give Cline permission to be in the apartment and, although Cline denied it, his fingerprint was identified on a headphone case inside the apartment, placing Cline there.

¶ 11 Cline obtained posttrial counsel, who filed a motion and supplemental motion for a new trial, alleging, in part, that trial counsel did not examine Dennewitz to undermine his conclusion that the recovered fingerprint belonged to Cline. At the hearing on Cline's motion, trial counsel testified that his strategy was twofold. First, he sought to convince the court that Dennewitz assumed "the other part of the fingerprint" belonged to Cline and thus had not made a "positive identification." To achieve that goal, he asked Dennewitz whether he had assumed the missing part of the print belonged to Cline. Counsel did not ask the court to look at the fingerprint evidence and draw a conclusion, as Dennewitz was an expert and had testified five times before. Second, in any event, the State failed to prove that Cline was not a guest of Slowinski's friend who had his house keys, and it was impossible to determine when Cline's fingerprint appeared on the headphone case.

¶ 12 In denying Cline a new trial, the trial court noted that trial counsel could have retained an independent fingerprint analyst to review Dennewitz's analysis. The court also noted Dennewitz had found at least 20 points of comparison and no evidence indicated that Dennewitz was incompetent. Cline received a sentence of eight years in prison.

¶ 13 Analysis

¶ 14 Cline contends the State failed to prove him guilty beyond a reasonable doubt when (i) the only evidence tying him to the offense consisted of a single, partial fingerprint on a "portable object" and (ii) Dennewitz's testimony regarding that partial fingerprint was incomplete. We agree.

¶ 15    When a defendant challenges his or her conviction based on the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. We make all reasonable inferences from the record in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from the facts. *Brown*, 2013 IL 114196, ¶ 48. In a bench trial, we owe "great deference" to the trial judge, but we are not "a mindless rubber stamp on every bench trial guilty verdict." *People v. Hernandez*, 312 Ill. App. 3d 1032, 1037 (2000). Our constitutional responsibility includes "examin[ing] the record for a lack of evidence linking the defendant to the crime charged." *Id.* We do so here and find the evidence wanting.

¶ 16    A person commits residential burglary when he or she knowingly and without authority enters or remains in the dwelling of another with the intent to commit a felony or theft there. 720 ILCS 5/19-3(a) (West 2014). No one disputes that someone went into Slowinski's apartment without his permission and took things. Cline disputes that he was that person.

¶ 17    To sustain a conviction based "solely on fingerprint evidence," the fingerprint must have been found in the immediate vicinity of the crime and under circumstances establishing beyond a reasonable doubt that the fingerprint was made at the time of the offense. *People v. Rhodes*, 85 Ill. 2d 241, 249 (1981). The particular location of the evidence or the surrounding "attendant circumstances" may establish the fingerprint having been left at the time of the offense. *People v. Campbell*, 146 Ill. 2d 363, 387 (1992). Of paramount importance, even above the considerations of location and timing, however, is that the evidence must allow a reasonable fact finder to conclude that the fingerprint found at the scene corresponds to defendant's known fingerprint. *Rhodes*, 85 Ill. 2d at 249.

¶ 18    We begin with the fingerprint expert's failure to follow standard analytical procedure for matching prints. This court has recognized, citing a wealth of precedent, that "ACE-V" is the accepted method for fingerprint comparison. *People v. Luna*, 2013 IL App (1st) 072253, ¶¶ 60-84. This method requires four steps: (i) *Analysis*, during which the examiner determines whether there is sufficient ridge detail to make a comparison between the latent fingerprint and the exemplar fingerprint; (ii) *Comparison*, during which the examiner does a visual measurement or comparison of the unique details of the prints; (iii) *Evaluation*, during which the examiner determines whether a "sufficient quantity and quality of friction ridge detail is in agreement between the latent print and the known print"; and (iv) *Verification*, during which another examiner repeats the first three steps and arrives at the same conclusion. *Id.* ¶ 61 (citing National Research Council of the National Academies, *Strengthening Forensic Science in the United States: A Path Forward* 137 (2009), https://www.ncjrs.gov/pdffiles1/nij/grants/228091. pdf [https://perma.cc/KMC9-7WG3]). In substance this method has been commonly accepted and followed by fingerprint examiners for "over the last hundred years" and as a four-step process since 1959. *Id.*

¶ 19    In *Luna*, we collected a sample of 16 state and federal cases rejecting challenges to the ACE-V method of fingerprint analysis under any standard of admissibility. *Id.* ¶ 68. Of course, this case does not involve admissibility, but the widespread acceptance of the ACE-V method as the proper analytical tool for fingerprint evidence warrants our taking judicial notice of it as the gold standard. *Id.* ¶ 69. The State's brief accepts the use of ACE-V as the proper methodology, and in light of the court's extensive analysis of the general acceptance of ACE-

V in *Luna*, we similarly take judicial notice of the ACE-V methodology as the proper technique.

¶ 20    Dennewitz did not refer to the ACE-V specifically during his testimony, but our review of the record and questioning at oral argument show that he performed only the first three steps. Dennewitz testified about the initial analysis, during which he determined whether (and which) prints were suitable for comparison. He then matched unique points of ridge detail on the unknown partial print to Cline's known print.

¶ 21    But, nothing in the record establishes that Dennewitz attempted to verify his results with another examiner. Cline describes this step as "integral" to the process, and based on the literature, we agree. The FBI describes verification as the step that "allow[s] for identifying potential errors committed in [analysis] of the first examiner." *Latent Prints: A Perspective on the State of the Science*, 11 Forensic Sci. Commc'n No. 4 (2009), https://archives.fbi.gov/archives/about-us/lab/forensic-science-communications/fsc/oct2009/review/2009_10_review01.htm#References [https://perma.cc/7NP4-TLLX]. This step has particular importance because "[i]n the United States, the threshold for making a source identification is deliberately kept subjective" in that "the outcome of a friction ridge analysis is not necessarily repeatable from examiner to examiner." National Research Council of the National Academies, *supra* at 139. In other words, the concurring judgment of two examiners carries weight, while the disparate judgments of two examiners provides ground for impeachment. Missing is whether Dennewitz took this critical step. See *People v. Negron*, 2012 IL App (1st) 101194, ¶ 23 (examiners results "verified independently by another latent print examiner"); *People v. Safford*, 392 Ill. App. 3d 212, 220 (2009) (examiner had "each of his print identifications *** verified by another examiner").

¶ 22    At oral argument, the State insisted Dennewitz could not have testified about an independent verification because that testimony would be inadmissible hearsay. It may have been. *People v. Yancy*, 368 Ill. App. 3d 381, 385 (2005) (citing *People v. Smith*, 256 Ill. App. 3d 610, 615 (1994)). We find, however, a simple fix: the State should have called the verifying examiner. The State called multiple witnesses to testify to each step of the fingerprint collection process—one who discovered and lifted the partial print, one who printed Cline for the comparison print, and Dennewitz, who analyzed the print. The only witness the State inexplicably failed to call was as crucial, a verifying examiner.

¶ 23    The State routinely calls multiple forensic experts, often in the same field, to speak to different stages of the analytical process. *E.g.*, *People v. Prince*, 362 Ill. App. 3d 762, 769-70 (2005) (forensic biologist testified that she analyzed floor mats and found presence of blood; two more forensic biologists testified they tested samples from same floor mats and arrived at same conclusion on origin of blood). Where, as here, the State's entire case hinges on a single partial fingerprint, confirmatory testimony in compliance with standard fingerprint procedure is essential to Dennewitz's inferential method and opinion.

¶ 24    In addition, Dennewitz repeatedly described the latent print as "partial" and admitted to extrapolating a conclusion about the missing portion of the print by making an assumption.

> "Q. You're assuming when you tell this Judge that the partial lift is the same print of Mr. Cline that the stuff that's not there *** is going to be the same, that's your assumption isn't it?

A. It's my opinion that from what I see on the partial print is the same. The stuff that I do not see I would, yes, I would have to assume that it's going to be the same if that was captured at the crime scene, but it's not."

The State " 'may not leave to conjecture or assumption' " essential elements of its case. *People v. Smith*, 2014 IL App (1st) 123094, ¶ 15 (quoting *People v. Laubscher*, 183 Ill. 2d 330, 335-36 (1998)).

¶ 25    The State relies on *People v. Span*, 2011 IL App (1st) 083037, that a single fingerprint is enough to convict. *Span*'s facts differ materially from this case. In *Span*, officers recovered two latent fingerprints from a Lays chip bag after the defendant robbed a 7-11 store. *Id.* ¶¶ 4-17. Because the parties stipulated to the testimony of the fingerprint examiner (see *id.* ¶ 17), nothing indicates whether the prints were full or partial prints or whether all the steps involved in ACE-V had been followed. Critically, a wealth of additional evidence supported guilt: (i) surveillance video showed the perpetrator leaning over the front of a counter and handling a bag of chips and (ii) one of the officers identified the defendant in court as the perpetrator after recognizing him from the video. *Id.* ¶¶ 5, 13-14. In stark contrast, we are confronted with a partial fingerprint as the only evidence purportedly linking Cline to the crime.

¶ 26    We also find unhelpful the State's equating the headphone case found in Slowinski's apartment to the jewelry box found in *People v. Ford*, 239 Ill. App. 3d 314 (1992). In *Ford*, the defendant left a fingerprint on a jewelry box during a burglary. *Id.* at 315. The jewelry box "had been in [the victim's] family for many years," and she had "never taken it out of her home" or permitted anyone to remove it from her dresser. *Id.* at 318. Here, nothing suggests that Slowinski treated the headphone case like the jewelry box's owner, that the headphone case never left his home, or how long he had owned the headphones. Of course, trial courts need not search for hypotheses supporting innocence (*People v. Newton*, 2018 IL 122958, ¶ 24), and had this been the only deficiency in the evidence, the case might have been decided otherwise. But, the evidentiary lapse vital to a fingerprint expert's identification cannot be excused or disregarded.

¶ 27    Additionally, some of the same problems with *Span*'s precedential value to this case apply equally to *Ford*. We know Dennewitz only compared Cline's print with the latent print at nine points; in *Ford*, there is no information about the completeness of the print because the examiner did not take notes. *Ford*, 239 Ill. App. 3d at 316. We know that the fingerprint expert did not verify his results with a second examiner; in *Ford*, there is no indication either way because the expert's only mention of a second examiner was the possibility that two examiners could theoretically disagree about their conclusions. *Id.* at 319. In short, the lack of testimonial detail about the sufficiency of the print analysis in *Ford* makes it an unhelpful comparison to the analysis of Cline's print, and the distinct difference between the type of objects on which the prints were left in both cases cements the lack of utility in attempting to compare the evidence here to that in *Ford*.

¶ 28    While the State bears the burden to prove the defendant guilty beyond a reasonable doubt (*People v. Murray*, 2019 IL 123289, ¶ 28), the finder of fact's determinations of the defendant's guilt "are not conclusive," and reversal is justified when the evidence is so unsatisfactory that there remains a reasonable doubt as to guilt. *Id.* ¶ 19. The State's case against Cline turns exclusively on a flawed examination of a single, incomplete fingerprint. On these facts, the State has failed to carry its burden.

¶ 29   Reversed.

¶ 30                 **SUPPLEMENTAL OPINION UPON DENIAL OF REHEARING**

¶ 31   The State filed a timely petition for rehearing, which we denied in a separate order. We reject two arguments the State made in its petition: (i) that the lack of testimony about verification does not mean verification never took place and (ii) that testimony about the testing procedure is merely foundational, as opposed to part of the substantive evidence the State must introduce to sustain its burden.

¶ 32   We take the second argument first and find that testimony about the steps of fingerprint verification is substantive testimony. The cases the State relies on for its broad assertion that "the absence of any mention of verification is relevant only to foundational issues" are distinguishable. For example, *People v. Woods*, 214 Ill. 2d 455, 468 (2005), involved a stipulation to the chain of custody, which is not at issue here. As to *People v. Bush*, 214 Ill. 2d 318, 321-22 (2005), the State ignores the substance of the parties' stipulation to a forensic chemist's testimony, which included: " 'he *** used tests and procedures commonly— commonly accepted in the field of forensic chemistry for the testing of narcotics.' " Of course, as we set out in our original opinion, the live testimony in Cline's case shows exactly the opposite—by omitting the verification step, the fingerprint expert failed to use testing methods commonly accepted by fingerprint experts.

¶ 33   We find a much closer analogy in decisions from our court and our supreme court examining the sufficiency of evidence in narcotics cases. For example, our supreme court has found evidence insufficient where a forensic chemist improperly tested only two of five packets containing a white rocky substance, leading to a disparity in the weight of the drugs (an essential element of the offense). *People v. Jones*, 174 Ill. 2d 427, 429-30 (1996). Similarly, we have found evidence of drug weight insufficient where a forensic chemist improperly commingled the contents of six packets of suspected heroin. *People v. Clinton*, 397 Ill. App. 3d 215, 223 (2009). The gravamen of these cases is that an analyst's proper *performanc*e of testing protocol is part of his or her substantive testimony, not merely foundational, and can therefore lead to a failure of proof. We find the lack of testimony about fingerprint verification to be more analogous to the failures in *Clinton* and *Jones* than to other, more technical aspects of foundation (*e.g.*, functioning equipment, chain of custody, acceptance of a scientific test or method more broadly in the scientific community).

¶ 34   Having found the testimony about fingerprint verification to be substantive, we must necessarily reject the State's first argument because it drastically diminishes its burden of proof in a criminal case; indeed, taken to its logical conclusion, the State's argument hollows out its burden entirely. The State argues, citing *People v. Austin*, 2017 IL App (1st) 142737, ¶ 69, that "absence of evidence is not evidence of absence." Read in isolation, this quotation inverts the standard of proof allowing the State to proceed by silence instead of presenting evidence to prove its case.

¶ 35   In any event, the State's selective quotation misapplies *Austin*. There, the State charged the defendant with, among other things, armed robbery. *Id.* ¶ 1. To prove the firearm element of the offense, three officers testified that the defendant had a "black" or "blue-steel" handgun, and two lay-witnesses also testified that the defendant had a gun. *Id.* ¶ 69. The only evidence the State did not supply was the gun itself. *Id.* In context, this court's quotation of the maxim "absence of evidence is not evidence of absence" applied only to the physical production of

the gun, not to evidence of the gun writ large. Of course, the State had to present *some* evidence about the presence of the gun—either testimony or the gun itself. Our statement in *Austin* did not absolve the State of *its* burden to present affirmative evidence of the elements of the offense.

¶ 36    Here, evidence of a partial fingerprint is the only evidence linking Cline to the offense—in other words it was part of the essential element of his identity as the offender. There is absolutely no testimony that the fingerprint analyst verified his results. A more analogous situation to *Austin* would be testimony about verification uncorroborated by the verifying witness or a second report. We are instead left with the question, "What inference can be drawn concerning [the verification of fingerprint testing results]? Without more, the answer is none at all." See *Jones*, 174 Ill. 2d at 427. It was the State's burden to provide sufficient evidence from which the trial court could draw a reasonable inference that the partial fingerprint found on the scene belonged to Cline. It failed to do so here. We adhere to our original disposition and reverse the circuit court's judgment.

¶ 37    JUSTICE WALKER, specially concurring:

¶ 38    I agree with the decision to reverse defendant's conviction because the fingerprint analysis was not verified by another examiner. However, I must write separately because the fingerprint itself was insufficient evidence to sustain a conviction beyond a reasonable doubt in this case. The only evidence linking defendant to the crime is a single, partial fingerprint on a portable item. There was no evidence that defendant left his partial fingerprint "under such circumstances as they could only have been made at the time the crime occurred." *People v. Span*, 2011 IL App (1st) 083037, ¶ 35. Therefore, I find that the State failed to establish the temporal proximity of the fingerprint to the burglary. Fingerprint evidence is circumstantial evidence. *Id.* Hence, to sustain a conviction solely on circumstantial fingerprint evidence, the fingerprint must satisfy both the physical and temporal proximity criteria. *People v. Gomez*, 215 Ill. App. 3d 208, 216 (1991).

¶ 39    Here, defendant's fingerprint was only found on a headphone case and nowhere else in the apartment. The headphone case was located where other items were stolen, so the physical proximity criterion is satisfied, but the temporal proximity was not satisfied because the headphone case is portable. I recognize that the portability of an object alone does not defeat temporal proximity. In *People v. Ford*, 239 Ill. App. 3d 314 (1992), following a burglary, the only fingerprint suitable for comparison was found on a silver jewelry box. There was testimony that the jewelry box had never been taken out of the house. *Id.* at 317-18. This court held that, because of this fact, defendant's fingerprint on the jewelry box satisfied the temporal proximity criterion. *Id.* at 318.

¶ 40    Here, Slowinski did not testify that he had never taken the headphone case out of his apartment. Given the nature of headphones and a headphone case, it is reasonable that Slowinski traveled with them. Headphones and headphone cases are not like a jewelry box, a vase, silverware, a television, or bookcase, which are generally kept at home. Many residents of this state have been walking behind someone who dropped a phone or a headphone case, and residents have then picked up the item to be immediately returned as a courtesy. The residents naturally left a fingerprint on the item. Because of the nature in which headphones and headphone cases are used, a reasonable person cannot conclude that the partial fingerprint must have been made during the burglary. I find the evidence here is unsatisfactory. Where

there is no other evidence linking defendant to the crime, a single fingerprint on a portable item that is generally brought into the public does not satisfy the temporal proximity criterion to find guilt beyond a reasonable doubt.