2023 IL App (1st) 201331-U

No. 1-20-1331

Order filed June 22, 2023

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 11319 |
| | ) | |
| ENRIQUE PEREZ, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for violating the Sex Offender Registration Act where the evidence presented was sufficient to sustain his conviction. Defendant forfeited his claim that the trial court denied him due process by considering matters outside the trial evidence. The claimed error was not plain error.

¶ 2    Following a 2019 bench trial, Enrique Perez was convicted of violating the Sex Offender Registration Act (Act) (730 ILCS 150/1 *et seq.* (West 2018)) and sentenced to two years' imprisonment. On appeal, defendant contends that the trial evidence was insufficient to convict

him beyond a reasonable doubt. He also contends that the trial court deprived him of due process when it told him during trial to provide evidence of current registration and admitted that his failure to do so was a factor in its finding of guilt. For the reasons stated below, we affirm.[1]

¶ 3    Defendant was charged with violating section 3(a) of the Act by, between April 28, 2017, and July 19, 2018, knowingly failing to register in person with the Chicago police within three days of "establishing a residence or temporary domicile" in Chicago, Cook County, when he had a prior military conviction for aggravated sexual assault. 730 ILCS 150/3(a)(1), (b) (West 2018).

¶ 4    Defendant was arrested on July 19, 2018, and released on bond the next day.

¶ 5    At the November 2019 trial, the State offered into evidence a certified copy of defendant's military conviction. Specifically, the Army Court of Criminal Appeals certified that defendant was convicted upon a 2011 guilty plea of various offenses, for which he was sentenced to demotion, forfeiture of pay, confinement for five years and three months, and dishonorable discharge. One of the charges to which defendant pled guilty was engaging in sexual acts with a "substantially incapacitated" woman; specifically, penetrating her vulva with his penis and touching her breasts. Another charge to which he pled guilty was committing sodomy with the same woman "by force and without [her] consent."

¶ 6    Harry Miller of the federal Bureau of Prisons (Bureau) testified that defendant was a federal prison inmate in December 2016 when Miller and two other Bureau employees spoke with him about his release plan. A release plan includes discussing an inmate's obligations following release, and defendant was told about his obligation to participate in sex offender registration. Defendant was asked for the address where he would live following release, but defendant would

---

[1] This matter was recently assigned to Justice Rochford's docket.

not provide one. Defendant also would not sign the release plan acknowledging that he was informed of his obligations. Miller recognized and identified a copy of defendant's release plan.

¶ 7    A second meeting was held with defendant in January 2017, after his release date changed, to again discuss his release plan. While Miller did not attend this meeting, defendant's release plan was included in his Bureau file in the course of Bureau business, and Miller read it and was familiar with it. The January 2017 release plan indicated that defendant was advised of his registration obligations and did not provide a post-release address. While an inmate was usually provided a list of where he or she would have to register, defendant could not be provided such a list because he did not provide a post-release address.

¶ 8    Miller participated in defendant's final program review ahead of his release, in which inmates are reminded of their registration obligations, and Miller testified that the program review documents are also kept by the Bureau in the course of its business. Defendant did not sign acknowledgements that he was advised of his registration obligations or that he was provided a list of sex offender treatment programs.

¶ 9    On cross-examination, Miller acknowledged that he did not attend every inmate's release plan meeting, but he would review the plan before signing it if he did not attend. No recording or notes were made of meetings beyond the plan documents. Another Bureau employee told defendant of his registration obligations in the December 2016 meeting, but Miller was present for the entire meeting and "backed her up. *** I told him the reason why he should sign it; and we tried to get a release address from him." The Bureau did not have a release address for defendant "[b]ecause he wouldn't tell us." The December 2016 plan indicated that defendant would be homeless. Miller did not attend the January 2017 meeting, but he knew defendant was advised of

his registration obligations because the employee who did so told Miller and Miller reviewed the plan documents.

¶ 10    The court admitted into evidence, as business records, the Bureau documents referenced in Miller's testimony. Two Bureau documents, from December 2016 and January 2017, both state that defendant "has been advised by staff of the conditions of his supervision, to include registering as a sex offender. He will not provide staff with an actual release residence." He was also advised to report to federal probation authorities after his April 2017 release, "[h]owever, he advises staff he will not report." A March 2017 Bureau document recites "You are subject to registration as a sex offender in any state in which you reside, are employed, carry on a vocation, or are a student." All three documents have a place for defendant to sign, which have been filled in with "refused to sign" or "refuses to sign."

¶ 11    Enrique Perez Gonzalez (Gonzalez)[2] testified that he lived on the 1600 block of West 16th Street (the 16th Street home) with his wife. He identified defendant as his son. After unsuccessfully invoking the right against self-incrimination, Gonzalez admitted that defendant was living "[i]n my home," specifically the 16th Street home, after his release from prison. Defendant was living in Gonzalez's home when he was arrested.

¶ 12    On cross-examination, Gonzalez could not recall when defendant was released from prison. Gonzalez's home had two bedrooms, one for Gonzalez and his wife and the other for defendant. Gonzalez was asked if he knew whether defendant actually slept in his bedroom, since Gonzalez would be sleeping in another bedroom. Gonzalez replied that defendant "has his bedroom."

---

[2] Throughout the record on appeal, the witness is also referred to as Enrique Perez, Sr. We use the name by which he identified himself at trial, Enrique Perez Gonzalez.

Defendant did not own the 16th Street home or pay any of the utility bills. When asked if he "spent 24 hours a day with [defendant], since he was released from prison," Gonzalez replied "More of the time, not all of it. More of the time, I spent with him."

¶ 13   Sergeant Edmund Echevarria of the Chicago Police Department testified that he was the commander of the criminal registration unit, the sole location in Chicago for registering under the Act. Echevarria explained the registration process, including paper cards, logs, and files of registration information kept by his unit and various information systems into which registration information is input. Pursuant to a subpoena, Echevarria's unit searched the records for defendant but found no registration file or paperwork by someone bearing defendant's name and birthdate. Based on that absence and to the best of Echevarria's knowledge, defendant must not have come to his unit to register.

¶ 14   Echevarria explained that, had defendant come to register but his effort was incomplete or unsuccessful, a document would nonetheless have been generated, but none was found. Similarly, the unit's logs from April 28, 2017, to July 20, 2018, reflected all persons who registered or attempted to register during that period. Echevarria identified those logs at trial. He testified that they are kept in the normal course of his unit's business, and he had reviewed them before trial. The trial court admitted into evidence the logs kept by Echevarria's unit from April 28, 2017, to July 20, 2018.

¶ 15   On cross-examination, Echevarria testified that his unit sometimes receives notice that a sex offender is being released and plans to come to Chicago. It rarely receives such notice from the Bureau, and Echevarria did not recall receiving such notice for defendant.

¶ 16    Belkis Sandoval, a deputy United States marshal, testified that she was assigned to look for a noncompliant sex offender on July 19, 2018. She had defendant's name and date of birth, and a copy of a driver's license bearing his name, photograph, and home address as the 16th Street home in Chicago. She went to the 16th Street home in Chicago and was admitted by a woman. There, Sandoval found defendant and Gonzalez. As the woman helped defendant gather clothes, Sandoval spoke with Gonzalez. Defendant then was arrested. On cross-examination, Sandoval testified that defendant did not try to resist or flee and made no statements to her. Sandoval could not recall when the driver's license was issued.

¶ 17    The court admitted into evidence certified copies of defendant's driving record and state identification card. Two April 2019 certified documents from the Illinois Secretary of State (Secretary) reflect that Enrique Perez was issued an identification card and a driver's license in 2015, both listing his address as the 16th Street home. The license was renewed in August 2018 with no change of address, and the Secretary expressly certified that defendant's license was valid on April 28, 2017.

¶ 18    Defense counsel made a motion for a directed finding, which the court denied. Defendant exercised his right to not testify, and the defense rested.

¶ 19    The court then noted that the State must prove not only failure to register but mental state, and the court said it would "defer" the case. It told defense counsel:

> "if you are able to come back and show me that your client has registered, as some of the evidence appears he may have been required to, and even if it's late, I think that would be an important fact that I would be willing to consider and incorporate into the [t]rial record here, involving his mental state.

¶ 20    The court told defendant:

"I'm urging you to, *** if you show me you're registered, I think this would have some impact in where this [t]rial goes, and what happens with this [t]rial, and what may happen beyond the [t]rial.

And I'm asking you to strongly consider not putting anybody in a position where, you're going to complicate something *** that's already complicated.

You don't have to complicate it more. It's a criminal case. You're looking at a possible jail sentence of up to 5 years.

But I want to have all the information in front of me; and if I were to know that you have registered before this [t]rial is completed, that would be something that I would consider; and *** it would matter.

So, how many weeks would you like?

It doesn't have to be long. I'm hoping that we can resolve this. I'm trying to find a way to simplify this, and simplify everybody's life as opposed to complicating it.

I understand you may have some resentments."

¶ 21    Defendant interjected "I don't follow your Honor." The court continued: "You need to show me that you're registered, *** and I think that would go a long way towards *** easing this situation, and helping everybody get through it, and let everyone get on with their lives." Defense counsel did not object, and trial was continued for about two weeks.

¶ 22    Following the continuance, the court heard closing arguments. During the defense argument, the court asked whether defendant registered with the "federal government"; defense counsel answered "No" without objecting. The court then noted that defendant was out on bond

since his 2018 arrest and asked, "he's still not registering?" Counsel replied, without objection, "[h]e is still not registered." Counsel then completed her argument, including that "[t]he issue at hand is this specific charge and the specific elements in this [t]rial, not what [defendant] may or may not do in the future; and I believe that the State did not meet their burden of proof beyond a reasonable doubt."

¶ 23    The court found defendant guilty, expressly finding the State's witnesses credible. The court noted, based on "a strong sense from the witnesses that were called," that defendant believed the registration requirement was unfair and refused to obey. The court said it "tried to give a lengthy continuance to [defendant], and stay these proceedings on this [t]rial, give him a chance *** to register, and I think that would have been very relevant to this [t]rial and the issues in this [t]rial about his mental state."

¶ 24    The court allowed defendant to remain on bond pending sentencing. It "implore[d]" him to register before sentencing, which would "go a long way towards helping resolve this issue in a simpler fashion" and would be a condition of his sentence if he received probation.

¶ 25    Defense counsel filed, and amended, a posttrial motion challenging the sufficiency of the evidence. The amended motion also claimed that the trial court "improperly considered irrelevant facts and circumstances outside of evidence presented by the State" when it "repeatedly inquired as to whether or not the defendant had registered as a sex offender since *** the inception of this case" and "repeatedly referenced its concern that the defendant will not register as a sex offender in the future during its ruling."

¶ 26    Following an extended continuance due to the Covid pandemic, the court heard the posttrial motion in October 2020. Defendant focused on the sufficiency of the evidence but also argued that

it was improper for the court to consider in ruling at trial "whether or not [defendant] would register in the future and whether or not [he] had registered since the inception of his criminal case." Following the State's argument that it proved defendant guilty beyond a reasonable doubt, the court denied the motion. After expressly finding that the State proved defendant guilty beyond a reasonable doubt, the court said it "was giving a great deal of consideration to see if maybe he might register but we are where we are. *** I acknowledge his individual decisions to be where we are right now under all the circumstances. He was supposed to register, he didn't register, I found him guilty."

¶ 27    The court immediately held a sentencing hearing. During the hearing, defendant personally addressed the court, raising various issues with his case. He asserted he was arrested without a warrant and placed in a holding cell "for an unreasonable period of time" before an attempt at questioning. Defendant believed a sex offender being released from prison has to be placed on the sex offender registry by the authorities before he or she is obligated to register his or her residence. He stated he was not on the sex offender registry in Illinois or any other state, and no document instructed him to register with the Chicago police. When the court asked him if he had a military conviction for which he was imprisoned, defendant invoked the right against self-incrimination.

¶ 28    The court then said: "I'm really trying to find a way to keep you out of jail, but I know and you know that you did some time for some incident that happened while you were in the Armed Forces." Defendant responded "I cannot talk about it. I had secret clearance." The court replied:

"*** I'm telling you right now you are required by law to register as a sex offender. I know

    you don't want to and you may believe that there was something wrong with what

happened previously and that you shouldn't be in this position but this is the position you're in, you need to register.

I've tried for months to tell your lawyers to persuade you to try to register and try to mitigate this situation and make it simpler for everybody, most importantly for yourself. I'm asking you now will you register as a sex offender if I order you to."

Defendant again invoked the right against self-incrimination. The court noted that he could receive up to five years' imprisonment or could receive probation, but registration would be a condition of probation. The court revoked defendant's bond and continued the case for sentencing to November 2020. Before adjourning, the court told defendant that if he said at the next hearing he was willing to register, the court "will be inclined to release you from custody and give you a chance to do that before I go to sentencing."

¶ 29    In November 2020, the court sentenced defendant to two years' imprisonment. This appeal timely followed.

¶ 30    On appeal, defendant first contends that the trial evidence was insufficient to convict him beyond a reasonable doubt of violating the Act.

¶ 31    When the sufficiency of trial evidence is at issue, we must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Cline*, 2022 IL 126383, ¶ 25. Taking the evidence in the light most favorable to the State includes making all reasonable inferences from the evidence in the State's favor. *Id.* It is the responsibility of the trier of fact to weigh, resolve conflicts in, and draw reasonable inferences from the evidence, and we do not substitute our judgment for that of the trier of fact nor retry the defendant. *Id.* ¶¶ 33, 39; *People v. Jackson*, 2020

IL 124112, ¶ 64. The positive and credible testimony of a single witness is sufficient to sustain a conviction even if the defendant contradicts it. *People v. Harris*, 2018 IL 121932, ¶ 27. A trier of fact may consider the evidence in light of his or her own knowledge and observations in the affairs of life. *People v. Newton*, 2018 IL 122958, ¶ 28.

¶ 32    A trier of fact is not required to disregard inferences that flow normally from the evidence, nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *Cline*, 2022 IL 126383, ¶ 41. In other words, the State need not disprove or rule out all possible factual scenarios. *Newton*, 2018 IL 122958, ¶ 27. If the evidence as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt, it need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. *Jackson*, 2020 IL 124112, ¶ 70. A conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Cline*, 2022 IL 126383, ¶ 25.

¶ 33    Defendant was found guilty of violating section 3(a)(1), (b) of the Act. In relevant part, section 3(a) of the Act requires sex offenders (as defined in the Act) to, "within the time period prescribed in subsections (b) and (c), register in person and provide accurate information as required by the" State Police. 730 ILCS 150/3(a) (West 2018). Defendant does not dispute that his certified military conviction, including the particular allegations to which he pled guilty and for which he was sentenced, shows he is a sex offender under the Act. *Id.* § 2(A)(1)(a), (C).

¶ 34    Section 3(a)(1) provides that a sex offender who "resides or is temporarily domiciled for a period of time of 3 or more days" in the City of Chicago must register at a fixed location designated by the Superintendent of the Chicago Police Department. *Id.* § 3(a)(1). Section 3(b) provides that a sex offender, "regardless of any initial, prior, or other registration, shall, within 3 days of ***

establishing a residence \*\*\* or temporary domicile in any county, register in person as set forth in subsection (a)." *Id.* § 3(b). For purposes of the Act, "the place of residence or temporary domicile is defined as any and all places where the sex offender resides for an aggregate period of time of 3 or more days during any calendar year." *Id.* § 3(a).

¶ 35   The evidence was sufficient to prove defendant guilty of violating the Act. Gonzalez's testimony that defendant had a bedroom and lived at the 16th Street home, the fact that defendant was found and arrested there, and the Secretary's records all support a reasonable inference that defendant resided at the 16th Street home in Chicago since his April 2017 release from prison. His 2017 release date was shown by the Bureau records, which we shall address in more detail below. The Secretary's records showed defendant's driver's license and identification in 2017 listed his address as the 16th Street home. They also showed defendant renewed his license with the 16th Street home as his address in August 2018, after his arrest herein when he was on bond, supporting the inference that it was and remained his residence.

¶ 36   Sergeant Echevarria's testimony and the logs from his registration unit showed that defendant did not register or attempt to register with the Chicago police between April 28, 2017, and July 20, 2018, despite his residence in Chicago.

¶ 37   Lastly and crucially, Miller's testimony established that, before his release from federal prison, defendant was repeatedly informed of his obligation to register, and thus that his subsequent failure to register was a knowing failure. The trial court was not, and we are not, required to discount Miller's clear testimony that he was present when defendant was informed of his registration obligation in December 2016 merely because Miller himself did not speak the words to defendant. Similarly, Miller testified that three documents, which were admitted into

evidence, showed that Bureau employees informed defendant of his registration obligation in meetings routinely held by the Bureau. See Ill. R. Evid. 803(6) (eff. Sep. 28, 2018) (admissibility of a "memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity"). Miller testified that he was present for the meetings underlying two of the three documents and that he reviewed those documents before signing them when he did not attend meetings.

¶ 38    The fact that defendant did not sign the acknowledgements that he was admonished of his registration obligation supports a reasonable inference that he was admonished (as Miller's testimony and the Bureau documents show) but was avoiding creating a more definitive record that he was aware of his registration obligation because he intended to not register after his release. As stated above (*supra* ¶¶ 26-27), we must make all reasonable inferences in favor of the State.

¶ 39    In sum, we find the evidence that defendant knowingly failed to register as the Act requires, and as he was charged, was not so unreasonable, improbable, or unsatisfactory that reasonable doubt of his guilt remains.

¶ 40    Nevertheless, defendant contends his conviction must be reversed because the State did not present sufficient evidence that he established a "residence or temporary domicile in the City of Chicago" for a period of at least three consecutive days. Specifically, citing *People v. James*, 2019 IL App (1st) 170594, and *People v. Gomez*, 2017 IL App (1st) 142950, he argues that the State had to prove that he established a residence or temporary domicile at a *specific* location or address in Chicago for a period of at least three *consecutive* days. Defendant contends that the evidence at trial, viewed in the light most favorable to the State, established that he stayed with his father in

the city of Chicago "more of the time, not all of it," and this "vague statement" does not rise to the level of establishing residency or domicile under the Act.

¶ 41    There is no consecutiveness requirement in the Act, which in relevant part provides that a sex offender who "resides or is temporarily domiciled for a period of time of 3 or more days" in a municipality must register with the municipal police. 730 ILCS 150/3(a)(1) (West 2018). Neither *James* nor *Gomez* mentions three consecutive days. Indeed, the *James* court referred to proving that the defendant "had spent an *aggregate* of three days at the address given, which is what the statutory language requires in order for a violation to have occurred." (Emphasis added) *People v. James*, 2019 IL App (1st) 170594, ¶¶ 20-21; see 730 ILCS 150/3(a) (West 2018) ("the place of residence or temporary domicile is defined as any and all places where the sex offender resides for an aggregate period of time of 3 or more days during any calendar year"). *Gomez*, in turn, referred to proving that the defendant "resided in Chicago both on that day and at least two other days in that calendar year." *Gomez*, 2017 IL App (1st) 142950, ¶ 20.

¶ 42    Here, the testimony of defendant's father placed defendant in the 16th Street home, with his own bedroom and seeing him most of the time, from his prison release to his arrest, which other evidence showed to have been in April 2017 and July 2018, respectively. That period is clearly much more than three days, so that a reasonable trier of fact could infer defendant resided in the 16th Street home at least three days during a calendar year.

¶ 43    As to the specific location, "it is clear that the location of an offender's residence is a critical element in the offense of violating section 3 of SORA." *James*, 2019 IL App (1st) 170594, ¶ 20 (citing *Gomez*, 2017 IL App (1st) 142950, ¶¶ 28-30 (rejecting the State's proposition therein that "it was 'not required to prove exactly where defendant was staying or residing' to establish his

guilt.")). Here, all evidence relating to where defendant resided (had a bedroom and was seen by his father most of the time from his release until his arrest), declared his residence (to the Secretary), and was present (at his arrest) were consistent with one specific location: the 16th Street home. The State thus proved defendant resided at a particular residence in Chicago, the 16th Street home, for more than the requisite three days. We are not required to elevate to reasonable doubt the possibility that defendant had a bedroom in Gonzalez's home from his 2017 release to his July 2018 arrest but did not live there merely because Gonzalez could not confirm defendant spent every night in his bedroom and Gonzalez spent "[m]ore of the time, not all of it," with defendant.

¶ 44    This case is therefore distinguishable from *Gomez*, wherein the court concluded the State merely proved defendant was present in Chicago when he was arrested rather than that he "*resided in Chicago on that date*," let alone that "he had resided in Chicago both on that day and at least two other days in that calendar year, to reach the necessary three-day, temporary-domicile element under the statute." (Emphasis in original.) *Gomez*, 2017 IL App (1st) 142950, ¶ 20. The court held the State failed to prove that the defendant permanently resided, or was temporarily domiciled, in Chicago and, therefore, failed to prove he was required to register in Chicago. *Id.* Here, in contrast, the State did prove defendant resided in Chicago at a specific address for the necessary three days. In sum, we see no reason in *James* or *Gomez* to disturb our conclusion that the evidence was sufficient to convict defendant beyond a reasonable doubt.

¶ 45    Defendant also contends that the court deprived him of due process by "instructing" him during trial to provide evidence of current registration, thereby shifting the burden to the defense, and by "admitting" that his failure to register, a fact not in evidence, was a factor in its guilty finding.

¶ 46 The State responds that the court did not tell defendant to register until after the defense had rested its case, when the court had already determined on proper evidence that he was required to register but had not registered. It also contends that, in context of the entire record, the court was urging defendant to register as mitigation for sentencing purposes.

¶ 47 As a threshold matter, the State contends that defendant has forfeited this claim by not objecting at trial and has forfeited a plain-error argument by not raising one in his initial brief. Generally, a claim is forfeited for review if it is not both raised by objection at trial and preserved in the posttrial motion. *People v. Jackson*, 2022 IL 127256, ¶ 15. Failure to raise a claim at trial deprives the trial court of an opportunity to correct the error, and requiring a timely objection prevents "defendants from sitting idly by and knowingly allowing an irregular proceeding to go forward only to seek reversal due to the error when the outcome of the proceeding is not favorable." *Id.* However, the plain error rule provides that a reviewing court may consider a forfeited issue if the defendant shows a clear or obvious error and either (1) the evidence was so closely balanced that the guilty verdict or finding may have resulted from that error, or (2) the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *Id.* ¶ 19. Claims of forfeiture and plain error can themselves be forfeited by not raising them on appeal. *People v. Russell*, 2022 IL App (2d) 190733, ¶ 45; *People v. Phillips*, 2022 IL App (1st) 181733, ¶ 156.

¶ 48 Defendant's opening brief does address whether he preserved this error. In particular, defendant contends that trial counsel was not obligated to object to improper findings outside the evidence once counsel argued in closing that the State's evidence was insufficient, so that the issue was preserved by its inclusion in the posttrial motion. "[A] defendant need not interrupt a trial

court to correct a trial court's misapprehension, after defense counsel has just argued the same to the court." *People v. Mitchell*, 152 Ill. 2d 274, 324 (1992). Here, trial counsel argued to the trial court in closing, shortly after the court asked again if defendant was registered, that the focus of this case was whether the State proved that defendant knowingly failed to register under the Act as charged, not what he might or might not do in the future.

¶ 49    The claim on appeal is that "the trial court considered the lack of evidence of current registration, a fact not in evidence, in reaching its" finding. A reminder to the court in closing argument that it should consider the elements of the offense and not what defendant may do in the future, made long after the court first asked if defendant had registered, is not "argu[ing] the same [claim] to the court" as in *Mitchell*. The closing argument noted by defendant does not alter that trial counsel never objected when the court repeatedly asked if defendant registered, nor when it commented on the subject. Until the posttrial motion, trial counsel did not clearly claim that the court's inquiries and comments regarding current registration were improper or erroneous.

¶ 50    Defendant's failure to clearly object during trial deprived the court of the opportunity to stop pressing the matter of current registration and to avoid considering defendant's registration status in reaching its finding. Raising the claim in the posttrial motion, when it would be difficult to separate the current registration issue from the trial evidence, was no substitute. We reject defendant's argument that he preserved the issue in the trial court and find this claim forfeited.

¶ 51    Having found forfeiture, we turn to plain error, which defendant raises in his reply brief. See *People v. Ramsay*, 239 Ill. 2d 342, 412 (2010) (a defendant may raise plain error for the first time in a reply brief). Under both prongs of the plain error doctrine, the defendant has the burden of persuasion. *Jackson*, 2022 IL 127256, ¶ 19. Generally, the first step in plain error review is to

determine whether a clear and obvious error occurred. *Id.* ¶ 21. Here, however, assuming *arguendo* that the trial court erred in considering matters outside the trial evidence, specifically the lack of evidence demonstrating defendant had recently registered, we find the error did not amount to plain error under either prong of the analysis.

¶ 52    To prove first prong plain error, defendant must prove " 'prejudicial error'," *i.e.*, that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *People v. Adams*, 2012 IL 111168, ¶ 21 (quoting *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). In determining whether this prong has been met, we must make a " 'commonsense assessment' " of the evidence within the context of the circumstances of this case. *Id.* ¶ 22 (quoting *People v. White,* 2011 IL 109689, ¶ 139).

¶ 53    We find no first prong plain error here. We consider it key that the court did not either inquire as to defendant's current registration nor comment on it until after the State and defense both rested their cases. For the reasons stated above regarding the sufficiency of the evidence, the court had heard trial evidence sufficient to convict defendant *before* it raised the matter of his current registration. Accordingly, under the circumstances of this case, the evidence was not so closely balanced that the court's consideration of defendant's continued failure to register prejudiced him. The evidence presented at trial was sufficient to demonstrate his guilt before the alleged error occurred.

¶ 54    To prove second prong plain error, defendant must prove the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process. *Adams*, 2012 IL 111168, ¶ 21. Our supreme court has equated second prong plain error with structural error, and a defendant who establishes that structural error occurred need not show prejudice from the error

as "prejudice to the defendant is presumed because of the importance of the right involved." *Jackson*, 2022 IL 127256, ¶ 28. Conversely, trial errors subject to harmless error analysis are not structural, and even most constitutional errors are trial errors rather than structural. *Id.* ¶ 37 (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006)). "Courts apply the harmless error doctrine to most errors, constitutional and otherwise, to promote the public's confidence and respect for the criminal process by focusing on the underlying fairness of the criminal trial rather than on the presence of inconsequential error." *Id.* ¶ 72 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)).

¶ 55    Structural error is not limited to those identified by the United States Supreme Court: complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and a defective reasonable doubt instruction. *Id.* ¶¶ 29-30 (citing *Washington v. Recuenco*, 548 U.S. 212, 218 n.2 (2006)). That said, "we often look to the types of errors that the United States Supreme Court has found to be structural error and determine whether the error being considered is similar." *Id.* ¶ 30. "The commonality of these errors is that they affect the framework within which the trial proceeds, rather than mere errors in the trial process itself." *Id.* ¶ 29 (citing *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)).

¶ 56    Here, the claimed error is that "the trial court's inquiry below amounted to a private investigation," and "the trial court considered the lack of evidence of current registration, a fact not in evidence, in reaching its verdict." The trial court's deliberations in a bench trial are limited to the record made before the court in the course of the trial. *People v. Heard*, 2021 IL App (1st) 192062, ¶ 16. A court's determination based upon its private investigation or private knowledge,

untested by cross-examination or the rules of evidence, constitutes a denial of due process. *Id.* The presumption that the trial court considered only competent evidence can be rebutted by affirmative evidence to the contrary in the record. *Id.* ¶ 19.

¶ 57 Assuming *arguendo* that the trial court erred in pursuing and considering matters outside the trial evidence, we find that to be trial error; that is, an error in the trial process rather than an error affecting the framework within which defendant's trial occurred. The error of a trial court considering matters outside the record or conducting a private investigation requires reversal only when the court's reliance on matters outside the record is prejudicial. *People v. Smith*, 176 Ill. 2d 217, 238 (1997); *People v. Pellegrini*, 2019 IL App (3d) 170827, ¶ 64. Stated another way, such an error is subject to harmless error analysis. *People v. Salinas*, 383 Ill. App. 3d 481, 502 (2008); *People v. Dunn*, 326 Ill. App. 3d 281, 286-87 (2001); see also *In re T.R.*, 2019 IL App (4th) 190529, ¶ 98. Therefore, the alleged error before us is not structural and thus not second prong plain error. Because defendant cannot establish plain error, we honor his forfeiture of this claim.

¶ 58 Accordingly, the judgment of the circuit court is affirmed.

¶ 59 Affirmed.